[Cite as *State v. Walker*, 2025-Ohio-975.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-240357 |
|  |  |  | C-240358 |
| Plaintiff-Appellee, | : | TRIAL NOS. | B-2400748-A |
|  |  |  | B-2400555-B |
| vs. | : |  |  |
| NEOMANNI WALKER, | : | *O P I N I O N* |  |
| Defendant-Appellant. | : |  |  |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, and Appellant Discharged in Part

Date of Judgment Entry on Appeal: March 21, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** Defendant-appellant Neomanni Walker appeals his convictions for two counts of felonious assault and one count each of improperly discharging a firearm at or into a habitation ("improperly discharging a firearm"), having weapons while under disability ("WUD"), receiving stolen property, and theft.

**{¶2}** Walker asserts the trial court failed to make a sufficient inquiry to ensure he was intelligently, knowingly, and voluntarily waiving his right to counsel. Walker further argues the State failed to establish venue in the counts for felonious assault and WUD, and there was insufficient evidence to support his convictions for receiving stolen property and improperly discharging a firearm.

**{¶3}** We hold that the trial court satisfied the requirements to ensure Walker's waiver of counsel was intelligent, knowing, and voluntary despite Walker's attempts to obfuscate the judicial process. Further, the State established venue beyond a reasonable doubt regarding the counts of felonious assault and WUD, and the evidence was sufficient to support Walker's conviction for improperly discharging a firearm. The State concedes it did not prove all the elements of receiving stolen property. We reverse the conviction for receiving stolen property and Walker is discharged from further prosecution on that count. We affirm the trial court's judgments in all other respects.

## I.    *Factual and Procedural History*

**{¶4}** On the morning of February 4, 2024, Walker went to codefendant Ayla Belcher's apartment, asked her to take him to the gas station, and offered to pay for her gas. Belcher agreed and drove Walker and codefendant Kendall Alexander to the BP station on Glenway Avenue. Walker gave Belcher a bank card to make purchases inside the station. While Belcher was inside the station, Walker pumped gas for her

SUV and paid for it using another bank card. Walker then used the bank card to pay for gas for others' vehicles in exchange for payment via cash or a cash app. Belcher, Walker, and Alexander repeated this same operation at three different gas stations that morning.

{¶5} At some point that morning, Gerald Brown went outside his residence at 2836 Claypole Avenue to find the inside of his vehicle had been "ransacked."

{¶6} After Brown discovered his car had been ransacked, Walker returned to Brown's house, having directed Belcher to drive there and park down the street. Belcher saw Walker and Alexander walk up to Brown's house and approach Brown's car. When Walker and Alexander got to his car, Brown came back outside to find them standing there. Brown asked the two what they were doing to his vehicle and was answered with gunfire. Alexander shot at Brown, hitting him in his right thigh.

{¶7} After hearing the gunshots, Sarah Stockton, Brown's next-door neighbor, went to her bedroom window. She saw two men "yelling and chasing after" a black SUV, which Belcher had used to drive Walker and Alexander back to Brown's house and was now using to leave the scene, but without her passengers. One of the individuals chasing the SUV had a handgun. The action was captured by Stockton's home surveillance camera. Belcher eventually stopped to allow her passengers to enter the vehicle and drove off.

{¶8} Brown was transported to the hospital where he underwent surgery to remove the bullet from his thigh.

{¶9} Cincinnati Police Department ("CPD") investigator Detective Alexander McCoy responded to the scene to investigate. He observed blood, shell casings, and bullet holes on the exterior of Brown's home. He also discovered a car belonging to another neighbor of Brown, Velma Sanders, had been broken into on Claypole Avenue

that morning. Sanders reported that her credit cards had been stolen and used at the "BP at Glenway and Warsaw" and "the Warsaw Food Mart on Warsaw Avenue."

**{¶10}** Detective McCoy reviewed surveillance footage from Stockton's home camera and from the gas station on Glenway Avenue, which showed Walker, Alexander, and Belcher.

**{¶11}** Detective McCoy executed a search warrant on Walker's home, where, prior to his arrival, Walker had been apprehended by CPD's "Fugitive Apprehension Unit" and transported to the Hamilton County Justice Center. During the search, CPD Officer Alejandro Santa Jordan recovered a handgun in the basement of Walker's home. A search of the serial number on the handgun revealed that it had been reported stolen.

**{¶12}** Walker was indicted in the case numbered B-2400555-B for one second-degree-felony count of felonious assault in violation of R.C. 2903.11(A)(1) and one second-degree-felony count of felonious assault with specifications in violation of R.C. 2903.11(A)(2), one second-degree-felony count of improperly discharging a firearm at or into a habitation with specifications in violation of R.C. 2923.161(A)(1), and one third-degree-felony count of WUD due to having a prior felony conviction in violation of R.C. 2923.13(A)(3).[1] Walker was charged as being complicit in shooting Brown.

**{¶13}** In November 2024, Walker was indicted in the case numbered B-2400748-A for one third-degree-felony count of WUD in violation of R.C. 2923.13(A)(3), one fourth-degree-felony count of receiving stolen property in violation of R.C. 2913.51(A), and one fifth-degree-felony count of theft in violation of R.C.

---

[1] Counts one through four, respectively.

2913.02(A)(1).[2]

Crim.R. 44 Colloquy

**{¶14}** During a pretrial hearing, Walker informed the trial court that he wished to represent himself, stating, among other things, that having counsel was "a conflict of interest." The court engaged in an extensive inquiry to determine Walker's understanding of his decision to waive counsel and explain instances where having counsel would be advisable.

**{¶15}** Specifically, the court explained to Walker his constitutional right to counsel, whose duties would include investigating his case, raising defenses and mitigating factors, and applying the rules of criminal procedure and evidence. In explaining the dangers of proceeding pro se, the court pointed out various instances where Walker should have an attorney. At two different points, the court expressed that proceeding pro se was a "big mistake" and "strongly suggested" that Walker change his mind. Throughout the colloquy, the court suggested to Walker no less than eight times that he have counsel.

**{¶16}** The court asked Walker whether he had any formal legal education and stated that he would be held to the same standard as an attorney. The court also explained the procedures regarding direct- and cross-examination, how Walker must interact with the jury, and that the only way Walker could "tell his story" without counsel was to testify on his own behalf and run the risk of self-incrimination.

**{¶17}** Walker consistently responded that he did not understand the court's questions or explanations. The following exchange occurred during the court's inquiry:

---

[2] Counts two through four, respectively.

THE COURT: So when you say you don't understand it, that's all the more reason for you to have a lawyer help you.

THE DEFENDANT: No, sir.

THE COURT: Because you don't understand it.

THE DEFENDANT: The legal terms I understand don't mean what you think what I know they mean. Me saying I understand gives you the jurisdiction over me.

Further, Walker at times responded that he was "the beneficiary" and "the authorized representative to the defendant," and that he "wished to do no business with [the court's] corporation."

**{¶18}** Walker refused his right to counsel no less than seven times. He refused to sign a written waiver of counsel, repeating his assertion that he refused to do "business" with the court's "corporation," and that he "waive[d] no rights ever." Prior to trial, the court asked Walker if he wanted a continuance to review all the evidence against him. He refused. The court stated that Walker would have access to standby counsel throughout the trial.

<u>The Trial</u>

**{¶19}** The cases were joined and proceeded to a jury trial. Walker's standby counsel was available to him throughout trial.

**{¶20}** Brown described the events leading to Alexander shooting him at 2836 Claypole Avenue, in Cincinnati, Ohio. Stockton, Brown's neighbor, testified about the footage from her home surveillance camera, which showed Walker and Alexander running past her home after she heard the gunshots. During her testimony, Belcher identified Walker, Alexander, and her black SUV in the same footage. She also identified Walker's voice on the recording saying, "Bust at him, cuz." Belcher also

6

testified that she did not know that Walker and Alexander had firearms until the shooting. She testified that Walker congratulated Alexander on shooting Brown.

{¶21} McCoy testified to responding to 2836 Claypole Avenue in "Price Hill" to investigate the shooting. Presented with the surveillance footage from Stockon's camera, McCoy was able to identify Walker, Belcher, and Alexander, who he described as running toward Belcher's black SUV and pointing what appeared to be a firearm in the direction of Brown. McCoy also testified that he heard a male's voice yelling "Bust [at] [him], cuz" on the video.

{¶22} McCoy also identified the black SUV in the Glenway BP surveillance footage, with Belcher seated in the driver's seat, Alexander in a passenger's seat, and Walker approaching the SUV. Belcher was also shown the video and testified that Walker was in the video wearing the same colors as she had seen him in that day.

{¶23} McCoy recounted executing the search warrant on Walker's residence at "5009 Limberlost Avenue" and confirmed the address is in "Cincinnati, State of Ohio."

{¶24} Hamilton County Coroner forensic scientist John Heile testified as an expert in forensic analysis in firearms. His report showed the shell casings found at Brown's residence were fired from the same handgun recovered from Walker's residence.

{¶25} Nefertiti Warner testified that she reported her handgun stolen, and the theft occurred in Hamilton County, Ohio.

{¶26} CPD Officer Aubrey Pitts testified as the arresting officer in Walker's prior felony drug conviction and identified Walker in court.

{¶27} Walker moved for a Crim.R. 29 judgment of acquittal, which was denied. Walker objected only to the Glenway BP surveillance footage being admitted, which was overruled. Walker did not put on a defense, resting "on presumption of

innocence."

<u>The Jury's Verdict</u>

**{¶28}** The jury convicted Walker of both counts of felonious assault and of improperly discharging a firearm at or into a habitation in the case numbered B-2400555-B. It found Walker not guilty of the accompanying firearm specifications and WUD. The court merged the sentences for the first felonious assault with improperly discharging a firearm at or into a habitation and imposed consecutive sentences for a total aggregate sentence of 16-20 years in the Ohio Department of Rehabilitation and Corrections ("ODRC").

**{¶29}** The jury convicted Walker of receiving stolen property, theft, and WUD in the case numbered B-2400748-A. The court ordered that the sentences in each count be served consecutively for an aggregate term of five years and six months in ODRC, with a credit of 106 days. This term was to be served consecutively to the sentence imposed in the case numbered B-2400555-B.

**{¶30}** This appeal followed.

## II. *Analysis*

### A. *Wallace's waiver of his right to counsel was made knowingly, intelligently, and voluntarily.*

**{¶31}** In his first assignment of error, Walker argues the trial court failed to substantially comply with Crim.R. 44(A), and therefore, he did not knowingly, intelligently, and voluntarily waive his right to counsel.

**{¶32}** The appellate court reviews the propriety of a defendant's waiver of the right to counsel de novo. *State v. Wallace*, 2024-Ohio-4886, ¶ 24 (1st Dist.). Crim.R. 44(A) provides:

Where a defendant charged with a serious offense is unable to obtain

8

counsel, counsel shall be assigned to represent him . . . unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives their right to counsel.

**{¶33}** A defendant's right to counsel during the critical stages of the prosecution is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section I of the Ohio Constitution. *Wallace* at ¶ 25, citing *State v. Sherman*, 2023-Ohio-2142, ¶ 19 (1st Dist.). This includes the independent constitutional right to dispense with a lawyer's help when a defendant knowingly, intelligently, and voluntarily chooses to waive counsel. *Id.*

**{¶34}** The failure to execute a written waiver is harmless error where the trial court engages in a sufficient colloquy to determine whether the defendant fully understands and intelligently relinquishes the right to counsel. *Id.* at ¶ 26, citing *State v. Martin*, 2004-Ohio-5471, ¶ 39. The trial court needs only to substantially comply with Crim.R. 44. *Id.*, citing *Martin* at ¶ 38.

**{¶35}** A court substantially complies with Crim.R. 44 when it makes a sufficient inquiry to determine whether the defendant fully understands and intelligently relinquishes the right to counsel. *State v. Khamsi*, 2020-Ohio-1472, ¶ 40 (1st Dist.), citing *Martin* at ¶ 39; *see State v. Furr*, 2018-Ohio-2205, ¶ 8 (1st Dist.). An appropriate Crim.R. 44 colloquy touches on the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all the other facts essential to a broad understanding of the whole matter, as well as the role of defense counsel. *Wallace*, 2024-Ohio-4886, at ¶ 27-28 (1st Dist.), citing *Martin* at ¶ 40.

**{¶36}** The trial court must also inform the defendant of the disadvantages of

9

self-representation and explain that the defendant will be required to follow the same rules of procedure and evidence that normally govern the conduct of a trial. *Id*. at ¶ 28, citing *State v. Ott*, 2017-Ohio-521, ¶ 5 (9th Dist.). In the process, a defendant, "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id*., quoting *Faretta v. California*, 422 U.S. 806, 835 (1975).

**{¶37}** The failure to advise a defendant of the nature of the charges, the allowable penalties, and what possible defenses and mitigation might be available *is a factor* in determining whether the defendant sufficiently waived the right to counsel. (Emphasis added.) *Id*., citing *Ott* at ¶ 6. Overall, whether a defendant has intelligently waived his or her right to counsel is based "upon the particular facts and circumstances surrounding *that case*, including the background, experience, and conduct of the accused." (Emphasis added.) *Id*., quoting *State v. Obermiller*, 2016-Ohio-1594, ¶ 30.

<u>The trial court substantially complied with Crim.R. 44(A)</u>

**{¶38}** Here, during the Crim.R. 44 pretrial colloquy, the trial court explained to Walker his constitutional right to defense counsel and the role of counsel from investigation to trial. It also ensured that standby counsel was present throughout the proceedings in case Walker had questions or changed his mind. *Contrast Wallace*, 2024-Ohio-4886, at ¶ 36-38 (1st Dist.) (no waiver of counsel found because, among other factors, the trial court failed to recognize it could appoint advisory/standby counsel at appellant's request).

**{¶39}** Walker concedes that the court asked him if he was aware of any defenses that he could raise and that he would be unaware of such defenses if he were to proceed pro se. Walker also concedes the trial court "attempted to explain the danger of self-representation."

10

**{¶40}** The court did more than make an attempt. Walker's responses prompted the trial court to urge Walker to have counsel on numerous occasions. The court cautioned Walker that he would be held to the same standard as an attorney. It asked if Walker had any legal education. It repeatedly informed Walker of the range of prison time he was facing. It went to great lengths to ensure Walker understood why counsel was imperative from investigation through trial and plainly stated to Walker its disagreement with his waiver of counsel. *See State v. Sellers,* 2021 Ohio App. LEXIS 2056, *7 (1st Dist. June 23, 2021) (Substantial compliance found where the trial court reviewed with Sellers the risks associated with waiving his right to counsel, possible punishment he faced if found guilty, that possible defenses were available to Sellers and that he would be held to the same standard as an attorney during trial.); *Khamsi*, 2020-Ohio-1472, at ¶ 40 (1st Dist.) (The trial court meticulously and thoroughly complied with Crim.R. 44(A) by, inter alia, repeatedly warning defendant of the disadvantages of proceeding without counsel, and explaining the nature and elements of the charges, possible defenses to the charges, and potential sentences.).

**{¶41}** The court went above and beyond as it even pointed out factors the jury could see as unfavorable toward Walker. In one instance, the State explained that Walker should stipulate to his prior felony conviction, and the court informed Walker that doing so would keep the jury from seeing that evidence. The court also gave Walker the opportunity to continue the trial to obtain regular clothing twice, once stating, "It's usually a good idea," to wear regular clothes at trial versus his "jail uniform."

**{¶42}** The trial court did not state all the charges that Walker was facing in the case numbered B-2400748-A or that Walker was charged with complicity in the case numbered B-2400555-B during the Crim.R. 44 colloquy. However, the failure to

advise a defendant of the nature of the charges, the allowable penalties, and what possible defenses and mitigation might be available is *but a factor* in determining whether a defendant sufficiently waived the right to counsel. *Wallace*, 2024-Ohio-4886, at ¶ 28 (1st Dist.), citing *Ott*, 2017-Ohio-521, at ¶ 6 (9th Dist.). Thus, the trial court's failure to explicitly state that Walker was also charged with theft and receiving stolen property, or that Walker was being charged as complicit in the felonious assaults and improperly discharging a firearm, does not amount to failure to substantially comply with Crim.R. 44(A).

**{¶43}** Walker asserts that his "spouting sovereign-citizen gibberish" should have made the court "recognize that such a defendant would require a longer, more detailed examination than a cooperative defendant" for "as long as necessary to insure [sic] that he was aware of all facts so that he had a broad understanding of his decision to waive trial counsel."

**{¶44}** In *State v. Jordan*, 2020-Ohio-4447 (1st Dist.) the appellant refused to be represented by assigned counsel. Using "gibberish" indicating that he is a sovereign citizen, he refused to sign the waiver of counsel but made it clear that he did not want counsel to represent him. This court held:

> Thus, while Mr. Jordan's waiver does not constitute a textbook illustration of the rule, the trial court bent over backwards to explain everything to him, affording him multiple opportunities to invoke his right to counsel. Sometimes, with "sovereign citizens" who seem to delight in obfuscation, a court can do no more. The record reflects that the trial court engaged Mr. Jordan in a detailed and lengthy explanation regarding what his waiver of counsel entailed, which substantially complied with Crim.R. 44(A). We have similarly upheld waivers in cases

12

involving uncooperative criminal defendants (often imagining themselves some sort of "sovereign citizen") who refuse to properly respond to the waiver inquiry, when the trial court nevertheless engaged in a detailed discussion of the waiver with the defendant.

*Id.* at ¶ 11.

**{¶45}** Walker's responses to the court's Crim.R. 44 inquiries were an apparent attempt to obfuscate the judicial process. This is further evidenced by Walker's statement that he did not want the court to establish jurisdiction over him. Here, the trial court could "do no more." *See id.*

**{¶46}** Walker's persistent refusal to have counsel indicated that he wished to waive this right. He made his decision with "eyes open." The record supports the conclusion that Walker knowingly, intelligently, and voluntarily waived his right to counsel. He cannot now complain about the consequences of that decision. *See Khamsi*, 2020-Ohio-1472, at ¶ 42 (1st Dist.), citing *Faretta*, 422 U.S. at 834, fn. 46 (A defendant who elects to represent himself cannot complain about the quality of his own defense.). Under the totality of the circumstances, the trial court substantially complied with Crim.R. 44.

**{¶47}** Accordingly, we overrule appellant's first assignment of error.

### B.  The State proved venue beyond a reasonable doubt.

**{¶48}** In his second assignment of error, Walker argues that the State did not prove that Brown's shooting occurred in Hamilton County, Ohio. Walker failed to raise this issue below, thus it must be reviewed for plain error. *State v. Hinkston*, 2015-Ohio-3851, ¶ 10 (1st Dist.).

**{¶49}** For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial. *State v. Payne*, 2007-Ohio-

13

4642, ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Lang*, 2011-Ohio-4215, ¶ 108, quoting *State v. Long*, 53 Ohio St.2d 91, (1978), paragraph three of the syllabus.

{¶50} Crim.R. 18(A) specifies that "[t]he venue of a criminal case shall be as provided by law." "Section 10, Article I of the Ohio Constitution fixes venue, or the proper place to try a criminal matter . . . ." *State v. Headley*, 6 Ohio St.3d 475, 477 (1983). Additionally, R.C. 2901.12(A) provides that the "trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and . . . in the territory of which the offense or any element of the offense was committed."

{¶51} Although venue is not a material element of any criminal offense charged, the State must prove beyond a reasonable doubt that the defendant committed the alleged crime in the county where the indictment was returned and the trial held. *Headley* at 477. While it is ideal that the State directly establishes venue, Ohio law has consistently held that venue "need not be proved in express terms so long as it is established by all the facts and circumstances in the case." *State v. Smith*, 2024-Ohio-5030, ¶ 2, quoting *Headley* at 477; *see State v. Lawson*, 2024-Ohio-2466, ¶ 10 (1st Dist.). Trial courts have broad discretion to determine the facts establishing venue. *State v. Jackson*, 2014-Ohio-3707, ¶ 144.

{¶52} Brown testified that his address was in Cincinnati, Ohio. While Walker is correct that Stockton never testified that she lived in Hamilton County, Ohio, the evidence circumstantially shows that, as Brown's next-door neighbor, it is where she resided. Stockton's front-door surveillance shows Alexander and Walker running past her home toward the black SUV after Brown was shot. Walker's case was investigated by CPD Detective McCoy. CPD is a police department commonly known to be in

14

Hamilton County, Ohio. Detective McCoy testified that he responded to the shooting at Brown's residence "in the Price Hill area," which Walker *concedes* is circumstantial evidence that Brown was shot in Hamilton County, Ohio.

**{¶53}** When the search warrant was executed on Walker's Cincinnati, Ohio residence, the handgun used to shoot Brown was found in Walker's basement.

**{¶54}** Detective McCoy testified that Sanders, Walker's neighbor, lived on Lehman which is around the corner from Claypole. Walker concedes that Sanders testified that "she lived in Hamilton County on Claypole five or six houses up from 2836 Claypole." Evidence reflected that Sanders' stolen credit cards were used at a BP gas station on Warsaw Avenue in the Price Hill area. The locations of the BP and the food store are commonly known to be in Hamilton County, Ohio. The BP gas station surveillance confirmed the identity of Walker, his codefendants, and Belcher's SUV as the same individuals and vehicle seen in Stockton's surveillance footage.

**{¶55}** The evidence either circumstantially or directly proved venue. It shows the offenses occurred on streets and in a neighborhood commonly known to be in Cincinnati, Hamilton County, Ohio. Further, Cincinnati police investigated the cases and the evidence was analyzed by the Hamilton County Coroner's office. *See Hinkston*, 2015-Ohio-3851, at ¶ 11-12 (1st Dist.) (Venue was established where the detective identified himself as a Cincinnati police officer and evidence was analyzed by the Hamilton County Crime Laboratory); *contrast State v. Sullivan*, 2014-Ohio-3112, ¶ 10-11 (The words "Hamilton County," "Cincinnati," or "Ohio" were never mentioned and the record was devoid of any other facts from which reasonable minds could conclude beyond a reasonable doubt that the offenses occurred in Hamilton County.).

**{¶56}** Accordingly, the State proved venue beyond a reasonable doubt. Walker's second assignment of error is overruled.

### C. Receiving stolen property

**{¶57}** In his third assignment of error Walker argues that his conviction for receiving stolen property was not supported by sufficient evidence. He asserts the State failed to produce evidence to show that Walker knew or should have known that the handgun that was recovered from his home was stolen.

**{¶58}** The State concedes this error. The record reflects there was no evidence offered to show that Brown knew the handgun recovered from the basement of his residence was stolen. Accordingly, Walker's third assignment of error is sustained.

### D. Sufficiency

**{¶59}** In his fourth assignment of error, Walker argues that the State failed to prove that he was complicit in the offense of improperly discharging a firearm at or into a habitation.[3] This argument fails on its face where Walker twice concedes on appeal that he directed Alexander to "Bust at him, cuz," and the record reflects that Brown was standing in front of his home when Alexander shot at him. Walker, however, asserts that this statement can only be construed as encouragement to shoot at Brown, not at his house.

**{¶60}** "Sufficiency" means "whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990). To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This is not a

---

[3] Walker incorrectly refers to B-2400555-A. The correct case number is B-2400555-B.

16

question of whether the State's evidence is credible but "whether, if believed, the evidence against a defendant would support a conviction." *Id.*, quoting *Thompkins* at 390.

**{¶61}** To present sufficient evidence on the charge of improperly discharging a firearm, the State needed to establish that Walker was complicit in the shooting of Brown, which consequently caused shooting damages to Brown's house. R.C. 2923.161(A)(1) provides that "no person, without privilege to do so, shall knowingly . . . [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." Pursuant to R.C. 2901.22(B):

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature . . . When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶62}** To prove complicity, the State had to show that Walker "act[ed] with the kind of culpability required for the commission of an offense" to "[a]id or abet [Alexander] in committing the offense." R.C. 2923.03(A)(2).

**{¶63}** Walker's argument that he encouraged Alexander only to shoot Brown but not his home is meritless. The fact that Brown was standing in front of his home when, after being encouraged by Walker, Alexander opened fire raised a high probability that Brown's home would also be shot. By conceding to being complicit in shooting Brown, it necessarily follows that Walker was also complicit in the shooting of Brown's house. Accordingly, the State provided sufficient evidence to support the

jury's verdict in finding Walker guilty of improperly discharging a firearm at or into a habitation.

**{¶64}** Walker's fourth assignment of error is overruled.

### III. Conclusion

**{¶65}** Because there was insufficient evidence to support Walker's conviction for receiving stolen property, we reverse that conviction and discharge Walker from further prosecution on that charge. We affirm the trial court's judgments in all other respects.

Judgment accordingly.

**CROUSE, P.J.,** and **NESTOR, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.